**No. 24-4019**

In The

# United States Court of Appeals

### For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*,

**v.**

**AARON ALBERT GOODE,**

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of North Carolina

_____

## Appellant's Brief

_____

Stephen J. van Stempvoort
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Appellant*

# Table of Contents

Page

Index of Authorities........................................................................... iii

Jurisdictional Statement ....................................................................1

Statement of the Issues......................................................................2

Introduction.........................................................................................3

    A.    Goode pleads guilty to Counts 1, 3, and 5 of the indictment.............................................................................4

    B.    The PSR determines that the Armed Career Criminal Act applies, and Goode is sentenced to 360 months' imprisonment. ...........................................5

Summary of the Argument.................................................................7

Argument ............................................................................................8

I.    Goode's second-degree murder conviction under N.C. Gen. Stat. § 14–17 (2001) is not categorically a violent felony for purposes of the ACCA.......................................8

    A.    Plain error review applies................................................8

    B.    This Court employs the categorical approach to determine whether a prior conviction is a "violent felony." .............................................................................8

    C.    A conviction under N.C. Gen. Stat. § 14–17 (2001) does not require the use or threatened use of physical force against anyone. ........................................9

    D.    A conviction under N.C. Gen. Stat. § 14–17 can be committed with a *mens rea* of recklessness. .............................17

    E.    Due to the trial court's plain error, Goode's sentence should be reversed. ........................................19

# Table of Contents

Page

II.   18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as-applied to Goode...................................22

    A.   This Court's review is de novo. ....................................22

    B.   For a firearm restriction to comply with the Second Amendment, the Government must affirmatively prove that there was an analogous firearm restriction in the founding era.....................................27

    C.   Section 922(g)(1) facially violates the Second Amendment because there is no founding-era analog that required felons to be permanently and categorically disarmed. ................................30

    D.   Section 922(g)(1) violates the Second Amendment as applied to Goode because there is no founding-era analog under which all felons like Goode were permanently disarmed.................................37

Conclusion ................................................................39

Statement Regarding Oral Argument ...........................39

Certificate of Compliance...........................................40

Certificate of Service .................................................41

# Index of Authorities

Page(s)

**Cases**

*Borden v. United States,*
593 U.S. 420 (2021)............................................................ 9, 16, 17, 19

*Class v. United States,*
583 U.S. 174 (2018)............................................................ 22, 23, 24, 25

*Commonwealth v. Vaughn,*
687 N.E.2d 270 (Mass. App. Ct. 1997) .............................................. 12

*Commonwealth v. Youngkin,*
427 A.2d 1356 (Pa. Super. Ct. 1981) ................................................. 12

*Coyle v. Commonwealth,*
653 S.E.2d 291 (Va. Ct. App. 2007) ................................................... 12

*District of Columbia v. Heller,*
554 U.S. 570 (2008)........................................................... 29, 35, 36, 37

*Firewalker-Fields v. Lee,*
58 F.4th 104 (4th Cir. 2023) ............................................................ 26

*Henderson v. United States,*
568 U.S. 266 (2013)........................................................................ 25, 26

*Johnson v. United States,*
559 U.S. 133 (2010)........................................................ 10, 13, 14, 15

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019)................................. 28, 31, 34, 35, 36, 37

*Mathis v. United States,*
579 U.S. 500 (2016)......................................................................... 20

*Menna v. New York,*
423 U.S. 61 (1975)......................................................................... 24

iii

## Index of Authorities

Page(s)

*Napier v. State*,
357 So. 2d 1011 (Ala. 1978) ................................................................ 12

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022)................... 4, 7, 25, 26, 27, 28, 29, 34, 35, 37, 38, 39

*People v. Hoerer*,
872 N.E.2d 572 (Ill. App. Ct. 2007) .................................................. 12

*Range v. Att'y Gen.*,
53 F.4th 262 (3d Cir. 2022)...................................................... 31, 32, 34

*Range v. Att'y Gen.*,
69 F.4th 96 (3d Cir. 2023) (en banc)................................ 28, 33, 34, 35

*State v. Arrington*,
819 S.E.2d 329 (N.C. 2018)........................................................... 17, 19

*State v. Hoon*,
815 N.W.2d 409 (Iowa Ct. App. 2012) .............................................. 12

*State v. Liner*,
391 S.E.2d 820 (N.C. Ct. App. 1990) ................................................ 11

*State v. Parlee*,
703 S.E.2d 866 (N.C. Ct. App. 2011) ................... 11, 12, 14, 15, 16, 18

*State v. Thomas*,
211 A.3d 274 (Md. 2019) ..................................................................... 12

*State v. Voss*,
488 S.W. 3d 97 (Mo. Ct. App. 2016)................................................... 12

*State v. Wells*,
2017 WL 476786 (Ohio Ct. App. 2017) .............................................. 12

*Stokeling v. United States*,
586 U.S. 73 (2019)................................................................................ 13

# Index of Authorities

Page(s)

*United States v. Canada*,
___ F.4th ___, 2024 WL 2807182 (4th Cir. June 3, 2024) .................. 22

*United States v. Castleman*,
572 U.S. 157 (2014) ....................................................... 14, 15

*United States v. Charles*,
No. MO:22-CR-00154-DC, 2022 WL 4913900
(W.D. Tex. Oct. 3, 2022) ...................................................... 31

*United States v. Collins*,
982 F.3d 236 (4th Cir. 2020) .............................................. 25

*United States v. Goins*,
647 F. Supp. 3d 538 (E.D. Ky. 2022) ................................... 36

*United States v. Hamilton*,
95 F.4th 171 (4th Cir. 2024) ........................................... 8, 13

*United States v. Harris*,
68 F.4th 140 (3d Cir. 2023) ................................................ 16

*United States v. Holden*,
638 F. Supp. 3d 931 (N.D. Ind. 2022) ................................. 36

*United States v. Hope*,
28 F.4th 487 (4th Cir. 2022) .............................................. 20

*United States v. Lee*,
658 F. App'x 185 (4th Cir. 2016) ........................................ 21

*United States v. Lozano*,
962 F.3d 773 (4th Cir. 2020) .............................................. 24

*United States v. Manley*,
52 F.4th 143 (4th Cir. 2022) .............................................. 18

*United States v. Mayo*,
901 F.3d 218 (3d Cir. 2018) .............................................. 15

v

# Index of Authorities

Page(s)

*United States v. Nelson,*
  37 F.4th 962 (4th Cir. 2022) .................................................... 8, 19, 21

*United States v. Olano,*
  507 U.S. 725 (1993)................................................................ 23

*United States v. Perry,*
  819 F. App'x 145 (4th Cir. 2020)............................................. 9

*United States v. Rumley,*
  952 F.3d 538 (4th Cir. 2020)................................................... 15, 16

*United States v. Shell,*
  789 F.3d 335 (4th Cir. 2015)................................................... 9

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010)................................................... 30, 31

**Statutes**

18 U.S.C. § 922(g) ..................................................................... 8

18 U.S.C. § 922(g)(1)............................ 2, 4, 5, 7, 19, 22, 26, 30, 36, 37, 39

18 U.S.C. § 924(a)(8)................................................................ 8

18 U.S.C. § 924(e) ................................................................... 6, 8

18 U.S.C. § 924(e)(2)(B)(i) ....................................................... 9, 13

18 U.S.C. § 3231 ..................................................................... 1

21 U.S.C. § 802 ....................................................................... 20

21 U.S.C. § 841(b)(1)(A)........................................................... 4

21 U.S.C. § 841(b)(1)(C)........................................................... 5

28 U.S.C. § 1291 ..................................................................... 1

# Index of Authorities

Page(s)

N.C. Gen. Stat. § 14–17 (2001) ........ 2, 3, 7, 8, 9, 10, 11, 12, 14, 16, 17, 19

USSG § 4B1.1 ............................................................................ 5

**Other Authorities**

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 Harv. J.L. & Pub. Pol'y 695, 712 (2009) ........................................ 31

Fed. R. Crim. P. 11(a)(2) .................................................... 23, 25

Joseph G.S. Greenlee, *The Historical Justification for
    Prohibiting Dangerous Persons from Possessing Arms*, 20
    Wyo. L. Rev. 249, 265 (2020) ................................................ 33, 34, 36

U.S. Const., amend. 2 ............................................................ 27

## Jurisdictional Statement

The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231.  Aaron Goode timely filed a notice of appeal, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

I.  Whether Goode's conviction for second-degree murder under N.C. Gen. Stat. § 14–17 (2001) is categorically a "violent felony" for purposes of the Armed Career Criminal Act.

II. Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as applied to Goode.

**Introduction**

The trial court erred in sentencing Goode under the Armed Career Criminal Act ("ACCA"). One of the predicate felonies upon which the presentence report relied is Goode's second-degree murder conviction under N.C. Gen. Stat. § 14–17 (2001). But the label that North Carolina attached to this statute—"second-degree murder"—is not dispositive. Instead, defendants can be convicted under the statute for conduct that does not involve any violent physical force, such that the statute does not categorically punish only "violent felonies."

For example, defendants have been convicted of second-degree murder under N.C. Gen. Stat. § 14–17 for selling a controlled substance to a customer in a voluntary commercial transaction, after which the customer accidentally overdoses and dies. In many jurisdictions, that would give rise only to an involuntary manslaughter charge. North Carolina, however, has convicted defendants in these circumstances of second-degree murder under N.C. Gen. Stat. § 14–17. Because the statute applies to defendants who have not used any violent physical force against another person, and because it applies to defendants who have a *mens rea* only of recklessness, a conviction under N.C. Gen. Stat. § 14–17

3

is not categorically a "violent felony" for purposes of the ACCA. At minimum, therefore, Goode's sentence should be reversed.

Goode's 18 U.S.C. § 922(g)(1) conviction is also unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Under *Bruen*, restriction on Second Amendment rights is justified only if the Government can affirmatively identify a Founding-era regulation that limited Second Amendment rights in a manner that is analogous to the challenged regulation. Aaron Goode was convicted in the district court under the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1). The Government failed to identify an analogous Founding-era regulation that demonstrates that felons like Goode were deprived of gun ownership rights by virtue of their status as felons. Both facially and as applied to Goode, § 922(g)(1) violates the Second Amendment.

### Statement of the Case

### A.    Goode pleads guilty to Counts 1, 3, and 5 of the indictment.

After being indicted on several charges, Goode pleaded guilty pursuant to a written plea agreement to three of them: Count 1, which charged him under 21 U.S.C. § 841(b)(1)(A) with conspiracy to distribute 1 kilogram or more of heroin, 5 kilograms or more of cocaine, and 400

grams or more of fentanyl; Count 3, which charged him under 21 U.S.C. § 841(b)(1)(C) with possession with intent to distribute a quantity of fentanyl; and Count 5, which charged him under 18 U.S.C. § 922(g)(1) with possession of a firearm by a felon. (JA15-20, 60).

The felon-in-possession charge in Count 5 was predicated on Goode's previous North Carolina felony convictions. (JA56). According to the presentence report ("PSR"), Goode was convicted of the following North Carolina felonies: two 1991 drug distribution convictions; two 1992 convictions for possession of stolen goods and felon in possession of a firearm convictions; a 1992 felon-in-possession conviction; a 1995 conviction for discharging a weapon into occupied property; three 1996 convictions for robbery with a dangerous weapon (two offenses occurred on March 22, 1995; the third occurred on August 24, 1995); a 1996 felon-in-possession conviction; and a 2001 second-degree murder conviction (offense occurred in 1995). (JA85-88).

**B.    The PSR determines that the Armed Career Criminal Act applies, and Goode is sentenced to 360 months' imprisonment.**

The PSR concluded that Goode was a career offender under USSG § 4B1.1. (JA93).

The PSR also concluded that, with respect to Count 5, Goode was subject to enhanced penalties under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1). The PSR predicated this finding on Goode's North Carolina convictions for (1) robbery with a dangerous weapon (two offenses, both of which occurred on March 22, 1995); (2) robbery with a dangerous weapon (offense occurred on August 24, 1995); and (3) second-degree murder (offense occurred on January 19, 1995). (JA87-88, 93).

Goode filed several objections to the PSR. (JA69-73). At the outset of the sentencing hearing, however, Goode, withdrew all previously stated objections to the PSR. (JA107). The district court therefore adopted the PSR's Guidelines calculations, setting Goode's total offense level at 43, his criminal history category at VI, and the advisory Guidelines range at life imprisonment. (JA107).

Ultimately, Goode was sentenced to 360 months' incarceration on Counts 1 and 5, and a concurrent 240 months on Count 3. (JA23, 123).

Goode timely filed this appeal. (JA29).

## Summary of the Argument

The trial court committed plain error in sentencing Goode under the ACCA. Goode's second-degree murder conviction under N.C. Gen. Stat. § 14–17 (2001) is not a "violent felony" for purposes of the ACCA because a defendant can be convicted under it without using any violent force against another person, and because it applies to defendants who have a *mens rea* only of recklessness. For example, N.C. Gen. Stat. § 14–17 has been applied to defendants who sell a controlled substance to a customer in a voluntary commercial transaction, after which the customer accidentally overdoses and dies. But because North Carolina's second-degree murder statute applies to that scenario as well, it is not categorically a violent felony, and the ACCA does not apply.

Moreover, under *Bruen*, the Government must affirmatively point to a Founding-era regulation that limited Second Amendment rights in a manner that is analogous to the way in which 18 U.S.C. § 922(g)(1) limits those rights. The Government failed to do so here. Both facially and as applied to Goode, § 922(g)(1) violates the Second Amendment.

**Argument**

**I.    Goode's second-degree murder conviction under N.C. Gen. Stat. § 14–17 (2001) is not categorically a violent felony for purposes of the ACCA.**

**A.    Plain error review applies.**

The trial court erred in sentencing Goode under the ACCA, 18 U.S.C. § 924(e). Because Goode did not assert this argument in the trial court, the district court's review is for plain error. *United States v. Nelson*, 37 F.4th 962, 966 (4th Cir. 2022).

**B.    This Court employs the categorical approach to determine whether a prior conviction is a "violent felony."**

In relevant part, § 924(e)(1) allows a court to impose up to a sentence of life imprisonment if the defendant is convicted of an offense under 18 U.S.C. § 922(g) and has "three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another . . ." 18 U.S.C. § 924(e)(1). Absent the ACCA, the maximum sentence for a § 922(g) conviction like Goode's is 15 years. *See* 18 U.S.C. § 924(a)(8).

This Court employs the categorical approach to determine whether an offense is a "violent felony." *United States v. Hamilton*, 95 F.4th 171, 173-74 (4th Cir. 2024). "What matters for the categorical approach is how

8

the law defines the offense generically, and not the particulars of how an individual might have committed the offense on a given occasion." *United States v. Shell*, 789 F.3d 335, 338 (4th Cir. 2015). The categorical approach asks whether "the most innocent conduct" covered by the statute of conviction would qualify as a "crime of violence" for purposes of the Guidelines enhancement. *Id.* at 339 (cleaned up). "If some violations of the statute are crimes of violence and others are not, then the state offense is deemed categorically overbroad and the conviction doesn't qualify." *United States v. Perry*, 819 F. App'x 145, 148 (4th Cir. 2020) (cleaned up).

### C.   A conviction under N.C. Gen. Stat. § 14–17 (2001) does not require the use or threatened use of physical force against anyone.

In relevant part, the ACCA defines "violent felony" as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). "The phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual." *Borden v. United States*, 593 U.S. 420, 429 (2021) (plurality op.). "[T]he phrase 'physical force' means violent force—that is, force capable of

9

causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). Thus, a felony is not a "violent felony" under the ACCA if "the merest touch suffices" for a conviction. *Id*. at 143.

The PSR here concluded that the ACCA applied because Goode purportedly had three previous North Carolina convictions for a "violent felony": (1) robbery with a dangerous weapon (two offenses, both of which occurred on March 22, 1995); (2) robbery with a dangerous weapon (offense occurred on August 24, 1995); and (3) second-degree murder (offense occurred on January 19, 1995). (JA87-88, 93). Goode's North Carolina conviction for second-degree murder, however, is not categorically a "violent felony," because it applies to defendants who have not used or threatened use of physical force against anyone.

Goode pleaded guilty to a second-degree murder charge under N.C. Gen. Stat. § 14–17 on February 26, 2001. (JA88). At that time, the statute provided as follows:

> A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, a Class A felony, and any person who

10

commits such murder shall be punished with death or imprisonment in the State's prison for life as the court shall determine pursuant to G.S. 15A–2000, except that any such person who was under 17 years of age at the time of the murder shall be punished with imprisonment in the State's prison for life without parole. Provided, however, any person under the age of 17 who commits murder in the first degree while serving a prison sentence imposed for a prior murder or while on escape from a prison sentence imposed for a prior murder shall be punished with death or imprisonment in the State's prison for life without parole as the court shall determine pursuant to G.S. 15A–2000. All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90–90(1)d., when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, and any person who commits such murder shall be punished as a Class B2 felon.

N.C. Gen. Stat. § 14–17 (2001).

This statute allows for a second-degree murder conviction when there is no application of force at all, such as when someone who purchases a drug from the defendant later dies of an accidental overdose. *See State v. Parlee*, 703 S.E.2d 866, 869 (N.C. Ct. App. 2011) (affirming second-degree murder conviction for providing Oxymorphone to overdose victim); *State v. Liner*, 391 S.E.2d 820, 822-23 (N.C. Ct. App. 1990) (affirming second-degree murder conviction for providing Dilaudid hydrochloride to overdose victim).

11

Second-degree murder in North Carolina is therefore an unusually broad offense. In many other jurisdictions, accidental overdose cases are prosecuted as either felony murder or involuntary manslaughter. *See, e.g.*, *State v. Thomas*, 211 A.3d 274 (Md. 2019) (affirming involuntary manslaughter conviction in death-by-overdose case); *State v. Wells*, 2017 WL 476786 (Ohio Ct. App. 2017) (same); *State v. Voss*, 488 S.W. 3d 97 (Mo. Ct. App. 2016) (same); *State v. Hoon*, 815 N.W.2d 409 (Iowa Ct. App. 2012) (unpublished); *Coyle v. Commonwealth*, 653 S.E.2d 291 (Va. Ct. App. 2007) (same); *People v. Hoerer*, 872 N.E.2d 572 (Ill. App. Ct. 2007) (same); *Commonwealth v. Vaughn*, 687 N.E.2d 270 (Mass. App. Ct. 1997) (same); *Commonwealth v. Youngkin*, 427 A.2d 1356 (Pa. Super. Ct. 1981); *see also Napier v. State*, 357 So. 2d 1011, 1012–13 (Ala. 1978) (discussing cases).

Under the version of N.C. Gen. Stat. § 14–17 under which Goode was convicted, however, a defendant who sold a painkiller pill to a customer could be found guilty of second-degree murder even though it was a voluntary, buy-sell transaction and even though he advised his customer not to "do anything destructive" and not to take the entire pill all at once. *Parlee*, 703 S.E.2d at 868. Even though most jurisdictions

would not deem this conduct to be second-degree murder, this Court's analysis is "bound by the interpretation of [the] offense articulated by [the relevant] state's courts." *Hamilton*, 95 F.4th at 174.

Because North Carolina interpreted its second-degree murder statute so broadly, convictions that are obtained under the statute are not categorically violent for purposes of the ACC. A defendant does not use, attempt, or threaten to use "physical force against the person of another" simply by selling them a substance that the customer later voluntarily ingests. 18 U.S.C. § 924(e)(2)(B)(i). It is a voluntary, economic transaction—albeit a reprehensible and morally culpable one—not a coercive one.

The discussion in *Stokeling v. United States*, 586 U.S. 73 (2019), illustrates the point. *Stokeling* ruled that "robbery offenses that require the criminal to overcome the victim's resistance" are "violent felonies" for purposes of the ACCA because "the force necessary to overcome a victim's physical resistance is inherently 'violent' in the sense contemplated by *Johnson*." *Id*. at 77, 83. "This is true because robbery that must overpower a victim's will—even a feeble or weak-willed victim— necessarily involves a physical confrontation and struggle." *Id*. at 83.

13

By contrast, "[t]he nominal contact that *Johnson* addressed involved physical force that is different in kind from the violent force necessary to overcome resistance by a victim" because it did "not require resistance or even physical aversion on the part of the victim; the 'unwanted' nature of the physical contact itself suffice[d] to render it unlawful." *Id.* at 82–83. And that is precisely what N.C. Gen. Stat. § 14–17 permits. It applies even when the victim dies after voluntarily ingesting a substance, where there is no struggle and the defendant does not overcome any resistance. *Parlee*, 703 S.E.2d at 869. The facts in *Parlee* evidenced no coercion at all. In fact, after the defendant sold the pill, the customer took it home and gave half of it to a third party, who voluntarily ingested it, resulting in an overdose. *Id.* There was no force; there was only a voluntary economic transaction that—combined with additional voluntary conduct on the part of both the customer and the ultimate victim—had unintended, fatal effects.

It is true that intentionally causing harm through the indirect application of force—such as "the act of employing poison knowingly as a device to cause physical harm"—is still a use of "force." *United States v. Castleman*, 572 U.S. 157, 170–71 (2014). But it is not a use of "*violent*

14

force," as is required under the ACCA. *Johnson*, 559 U.S. at 140. *Castleman* involved only the use of "force" "in the common-law sense." *Castleman*, 572 U.S. at 170. In fact, "[*Castleman*] expressly reserved the question of whether causing 'bodily injury' necessarily involves the use of 'violent force' under the ACCA." *United States v. Mayo*, 901 F.3d 218, 228 (3d Cir. 2018); *see also Castleman*, 572 U.S. at 170 (calling it "a question we do not decide"). Even if the effects of the chemical properties of a controlled substance upon a human body could constitute the indirect application of "force," there is nothing "violent" about that force. *Johnson*, 559 U.S. at 140. Its application to individuals like the victim in *Parlee* is not the result of any coercion.

Nor is this a situation where a *mens rea* requirement converts what is otherwise nonviolent force into violent force. *See, e.g.*, *United States v. Rumley*, 952 F.3d 538, 551 (4th Cir. 2020) ("[W]hen the mens rea is included in Rumley's hypothetical—that the person specifically intended to cause severe and permanent injury when he injured a dependent child by withholding care—the crime involves the use of physical force."). Unlike, for example, "a murderous parent [who] uses the body's need for food to intentionally cause his child's death" or a "parent [who] uses the

forceful physical properties of poison to achieve the same result," a defendant convicted under N.C. Gen. Stat. § 14–17 does not use any "violent force" at all. *Id.* at 551. Instead, the defendant engages in a voluntary, buy-sell transaction, after which the product sold later inadvertently kills its user. The statute applies even when the defendant specifically warns his customer to be careful when using the product. *Parlee*, 703 S.E.2d at 869. Although certainly reprehensible, that conduct does not involve the use of violent physical force.

That N.C. Gen. Stat. § 14–17 labels the offense as "second-degree murder" does not make a difference. The ACCA requires courts "to parse out different types of crimes to identify the prior convictions that expose a defendant as 'the kind of person who,' when armed, 'might deliberately point the gun and pull the trigger.'" *United States v. Harris*, 68 F.4th 140, 147 (3d Cir. 2023) (quoting *Borden*, 593 U.S. at 423). "That approach is under-inclusive by design: It *expects* that some violent acts, because charged under a law applying to non-violent conduct, will not trigger enhanced sentences." *Borden*, 593 U.S. at 442.

16

**D.    A conviction under N.C. Gen. Stat. § 14–17 can be committed with a *mens rea* of recklessness.**

Because the ACCS requires that the defendant must "direct his action at, or target, another individual," the ACCA's definition of "violent felony" also does not include "offenses criminalizing reckless conduct." *Borden v. United States*, 593 U.S. 420, 429 (2021) (plurality op.); *see also id*. at 446 (Thomas, J., concurring in the judgment). The version of N.C. Gen. Stat. § 14–17 to which Goode pleaded guilty applies to defendants who have only a *mens rea* of recklessness.

As the North Carolina Supreme Court explained, a defendant could be convicted of second-degree murder under the statute when the victim's death "stems from either an inherently dangerous act or omission *or a drug overdose*." *State v. Arrington*, 819 S.E.2d 329, 333 (N.C. 2018) (emphasis added). These scenarios are "less culpable" than those in which the defendant possessed an intent to harm, because they involved only "recklessness (an inherently dangerous act or omission) or a drug overdose." *Id*. Because a drug overdose can result in the death of a victim even when the defendant who sold the drugs has been merely reckless, N.C. Gen. Stat. § 14–17 is not categorically a violent felony.

17

Nor is this analysis changed by this Circuit's ruling that offenses that require a *mens rea* of "extreme recklessness" ordinarily are "violent" crimes. *United States v. Manley*, 52 F.4th 143, 151 (4th Cir. 2022). The decision in *Manley* defined "extreme recklessness" by referencing the definition of implied malice under Virginia law: "[T]he malice element 'may only be implied from conduct likely to cause death or great bodily harm, willfully or purposefully undertaken,'" and it "encapsulates a species of reckless behavior so willful and wanton, so heedless of foreseeable consequences, and so indifferent to the value of human life that it supplies the element of malice." *Id.* at 149–50.

At first blush, North Carolina's test for malice seems somewhat similar: Malice can arise "when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." *Parlee*, 703 S.E.2d at 869. But as *Parlee* demonstrates, the North Carolina courts have applied that seemingly similar standard to conduct that is much closer to mere recklessness than "extreme recklessness." Even the North Carolina Supreme Court described the type of second-degree murder that is at issue here as a "less culpable"

type involving "recklessness" or a "drug overdose": "[N.C. Gen. Stat. § 14–17] distinguishes between second-degree murders that involve an intent to harm (actual malice or the intent to take a life without justification) versus the less culpable ones that involve recklessness (an inherently dangerous act or omission) or a drug overdose." *Arrington*, 819 S.E.2d at 333.

Because the relevant version of N.C. Gen. Stat. § 14–17 allows for the conviction of a defendant who has a *mens rea* of recklessness, it is not categorically a violent felony for purposes of the ACCA. *Borden*, 593 U.S. at 429. The ACCA does not apply to Goode.

**E.    Due to the trial court's plain error, Goode's sentence should be reversed.**

Because the ACCA does not apply, Goode was sentenced on his 18 U.S.C. § 922(g)(1) conviction to a sentence that exceeds the available statutory maximum.

The trial court's error was plain. An error is plain if "the explicit language of a statute or rule resolves the question" before the Court. *United States v. Nelson*, 37 F.4th 962, 969 (4th Cir. 2022). The plain text of the ACCA and N.C. Gen. Stat. § 14–17 control the analysis here.

Moreover, an error in applying the categorical approach to determine whether a prior state conviction is an ACCA predicate is plain even if this Court has not previously engaged in the precise legal analysis that is required to demonstrate the error. For example, this Court held in *United States v. Hope*, 28 F.4th 487, 508 (4th Cir. 2022), that the district court's ACCA analysis was plain error even though the law was unclear about which version of a federal statute (21 U.S.C. § 802) should be consulted in determining whether the defendant's prior state conviction is a "serious drug offense" under ACCA. *Id.* at 507–08. Although this Court acknowledged that "we have not engaged in this specific analysis for 21 U.S.C. § 802," the Court nevertheless explained that the "method" of analysis is "settled law": "[P]rior to our review, we had already clarified how and when to use the modified categorical approach and how to conduct the backward-looking comparison for the categorical approach." *Id.* at 508.

The same is true here. The required method—applying the categorical approach to a defendant's prior state-law convictions—is settled law. *Mathis v. United States*, 579 U.S. 500, 509–10 (2016). And this Court has reversed lower courts' ACCA analysis under the plain-

20

error standard where prior state convictions do not amount to "violent felonies" under ACCA because they do not require "violent" physical force, as explained in cases like *Johnson. See, e.g.*, *United States v. Lee*, 658 F. App'x 185, 187 (4th Cir. 2016) (reversing as plain error the district court's reliance on defendant's attempted second-degree arson conviction as an ACCA predicate, despite defendant's failure to assert argument in district court).

The remaining factors of the plain-error standard are also met. Goode's substantial rights were affected because he cannot be sentenced in excess of the applicable statutory maximum. *Nelson*, 37 F.4th at 970; *Lee*, 658 F. App'x at 187. And sentencing a defendant in excess of the applicable statutory maximum "affects the fairness, integrity, or public reputation of judicial proceedings," as well. *Nelson*, 37 F.4th at 970 (internal quotation marks omitted). *See also id*. at 971 (noting the Court's "usual practice of giving the district court the chance to reconsider its sentencing decision as a whole when we disturb one portion thereof").

At minimum, therefore, Goode's sentence should be reversed.

**II.**    **18 U.S.C. § 922(g)(1) violates the Second Amendment, both facially and as-applied to Goode.**

Goode challenges his conviction under 18 U.S.C. § 922(g)(1) as unconstitutional under the Second Amendment. Goode is aware that, on June 3, 2024, this Court issued its published opinion in *United States v. Canada*, ___ F.4th ___, 2024 WL 2807182 (4th Cir. June 3, 2024). The Court held in *Canada* that the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), is not facially unconstitutional. *Id.* at *1. The *Canada* decision, however, left open the possibility that the statute may be unconstitutional on an as-applied basis. *Id.*

Goode asserts a facial challenge, notwithstanding the decision in *Canada*, in order to preserve his ability to assert that issue in the Supreme Court, if necessary. Goode also asserts an as-applied challenge, which is not controlled by the analysis in *Canada*.

**A.**    **This Court's review is de novo.**

Goode's guilty plea does not preclude his ability to challenge the constitutionality of the statute of conviction. *Class v. United States*, 583 U.S. 174, 182 (2018). With respect to Second Amendment arguments, specifically, a defendant may enter an unconditional plea of guilty and

nevertheless still challenge the statute of conviction on Second Amendment grounds on appeal. *Id*.

Goode did not assert a Second Amendment argument in the district court, but that does not change the standard of review, either. Ordinarily, the failure to assert an argument in the district court operates as a forfeiture of that argument on appeal. *See United States v. Olano*, 507 U.S. 725, 733 (1993). But *Class* held that a defendant who pleads guilty—even without entering a conditional plea—does not waive the right to bring a Second Amendment claim. *Class*, 583 U.S. at 182. *See also Olano*, 507 U.S. at 733 (explaining the difference between forfeiture and waiver).

If an unconditional guilty plea does not waive the ability to assert a Second Amendment argument on appeal, then a defendant who has entered such a plea should not be deemed to have forfeited the argument, either. After all, a conditional plea is a preservation tool, through which the defendant may preserve the ability to assert certain arguments on appeal. *See* Fed. R. Crim. P. 11(a)(2). By entering into an unconditional guilty plea, a defendant affirmatively determines not to preserve arguments for appeal. It would be unusual for a defendant who inadvertently missed a Second Amendment claim to be put in a worse

23

position than a defendant who enters into an unconditional plea and thereby affirmatively rejects the very tool that is available to him for preserving error for appeal. That may be why, in *Class*, the Court rejected the Government's argument that "a defendant who pleads guilty *cannot* challenge his conviction on appeal on a forfeitable or waivable ground that he either failed to present to the district court or failed to reserve in writing." *Class*, 583 U.S. at 183.

The same principles that motivated the decision in *Class* militate against finding forfeiture here. Where a Second Amendment claim "challenge[s] the Government's power to criminalize [his] (admitted) conduct" and "call[s] into question the Government's power to 'constitutionally prosecute' him," the argument should not be deemed forfeited on appeal, just as it is not waived on appeal even when the defendant has rejected the very tool at his disposal that would allow him to preserve it. *Class*, 583 U.S. at 181–82. A claim is not waived where it asserts that the prosecution "may not convict petitioner no matter how validly his factual guilt is established." *Menna v. New York*, 423 U.S. 61, 63 (1975). Under those circumstances, forfeiture should not apply, either. *See also United States v. Lozano*, 962 F.3d 773, 779 (4th Cir. 2020) (noting

24

that the rule applied in *Class* applies when defendants "challenge[] the government's power to prosecute *in the first instance*").

*Class* allows a defendant to assert a Second Amendment claim on appeal even after entering into an unconditional plea—that is, without preserving the Second Amendment claim for appeal. *See* Fed. R. Crim. P. 11(a)(2); *Class*, 583 U.S. at 182. It would be anomalous to hold that a far more strict standard of review should apply to a defendant who has likewise failed to preserve the Second Amendment claim, but did so by inadvertently failing to assert it. Either way, the defendant failed to preserve the argument. The same rule should apply in both circumstances. Goode's claim should be reviewed de novo. *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020).

In any event, even if this Court's review is for plain error only, there is still plain error. An error is plain if it is plain error by the time of the appeal, even if it was not plain when the case was pending before the trial court. *Henderson v. United States*, 568 U.S. 266, 279 (2013).

*Bruen* squarely holds that the Government has the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear

25

arms" by "identify[ing] a well-established and representative historical analogue . . ." *Bruen*, 597 U.S. 1, 19, 30 (2022).

It is undisputed that the Government did not take any steps in the district court to affirmatively prove that § 922(g)(1) comports with the Second Amendment. Even if plain-error review applies, therefore, it is undisputed that the Government did not take the steps that are plainly mandated by *Bruen* and failed to carry its burden. That failure amounts to plain error, given *Bruen*'s explicit requirements.

Thus, under any standard of review, Goode is entitled at minimum to a vacatur of the district court's judgment, due to the Government's failure to comply with the analysis that is now mandated by *Bruen*. *See Henderson*, 568 U.S. at 276 ("[A]n appellate court must apply the law in effect at the time it renders its decision." (citation omitted)); *Firewalker-Fields v. Lee*, 58 F.4th 104, 123 n.7 (4th Cir. 2023) (remanding where, after the *Lemon* test was eliminated in the Establishment Clause context, the party with the newly articulated burden of identifying relevant historical tradition failed to do so in the district court).

26

**B.    For a firearm restriction to comply with the Second Amendment, the Government must affirmatively prove that there was an analogous firearm restriction in the founding era.**

*Bruen* recalibrated the Second Amendment analysis, rejecting the two-part analysis that this Court (and many others) had previously adopted. Instead, under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The plain text covers Goode's conduct here; namely, the right of "the people" to "keep and bear Arms." U.S. Const., amend. 2.

(The Government has sometimes argued in similar cases that felons are not part of "the people" who have rights under the Second Amendment, such that defendants like Hunt fail the *Bruen* analysis right at the outset. But it would be exceedingly odd to interpret felons (not to mention groups like the mentally disabled) as falling outside "the people" who are protected by the Constitution, particularly when the First Amendment protects the right of "the people" peaceably to assemble and the Fourth Amendment enshrines the right of "the people" against unreasonable searches and seizures. Adopting the Government's position would require this Court to find that the Amendments use the same

phrase—"the people"—to mean different things. *See also Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting). *See also Range v. Att'y Gen.*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc) (discussing issue). To the extent that the Government gestures to the same argument here, it should be rejected.)

Because the Second Amendment presumptively prohibits prosecution of Goode for possessing a firearm, the Government must demonstrate that Goode was convicted for conduct that falls outside the right enshrined in the Second Amendment; that is, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Only if a firearm regulation is consistent with American historical tradition may a court conclude that "the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*.

The upshot of *Bruen* is that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. It is possible for the Government to do so through analogical reasoning.

Doing so "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 30.

But on the other hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 30 (cleaned up).

*Bruen* pointed to an example of analogical reasoning that would support the Government's assertion that particular conduct fell outside the ambit of the Second Amendment:

> Consider, for example, *Heller*'s[1] discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Id.* (internal citations omitted).

*Bruen*'s discussion of how the "sensitive places" doctrine may be analogically supported is instructive for the felon-in-possession context. For the Government to win the day with respect to the constitutionality of 18 U.S.C. § 922(g)(1), the Government must identify groups of individuals who were categorically prohibited in the founding era from possessing firearms based on their commission of a felony-analogous crime.

**C.** **Section 922(g)(1) facially violates the Second Amendment because there is no founding-era analog that required felons to be permanently and categorically disarmed.**

With respect to § 922(g)(1), the Government cannot carry its burden. "The historical evidence is inconclusive at best" on whether felons were excluded from the right to bear arms during the era of the Founders. *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting).

If anything, history indicates that "founding-era legislatures did not strip felons of the right to bear arms simply because of their status

as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). "After scouring the colonies' existing legislative records from 1607 to 1815, one historian could not find 'a single instance in which [the 14 colonies] exercised a police power to prohibit gun ownership by members of the body politic.'" *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *4 (W.D. Tex. Oct. 3, 2022). "Only four state constitutions had what might be considered Second Amendment analogues in 1791— Massachusetts, North Carolina, Pennsylvania, and Vermont—and none of these provisions excluded persons convicted of a crime." *Skoien*, 614 F.3d at 648–49 (Sykes, J., dissenting). *See also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 712 (2009) ("For relevant authority before World War I for disabling felons from *keeping* firearms, . . . one is reduced to three proposals emerging from the ratification of the Constitution.").

At best, the Government can point only to instances in which ideological enemies of the state were prevented from owning firearms, due to the state's concern that they may revolt against the civil authority. For example, after the English Civil War, Charles II "disarmed nonconformist (i.e., non-Anglican) Protestants." *Range v. Att'y Gen.*, 53

31

F.4th 262, 274 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). After the Glorious Revolution, the English Parliament enacted a restriction in 1689 "forbidding Catholics who refused to take an oath renouncing their faith from owning firearms, except as necessary for self-defense." *Id*. at 275. "[T]he . . . likely historical reason for disarming this entire group" was its "perceived disrespect for and disobedience to the Crown and English law." *Id*. After all, individuals burdened by the restriction could evade it by pledging ideological conformity: "When individuals swore that they rejected the tenets of Catholicism, their right to own weapons was restored." *Id*.

During the colonial era, it appears that at least a few groups of religious dissenters—*i.e.*, individuals deemed to be ideologically at odds with the state—were disarmed on that basis. *See id*. at 276–77. Given the recurrent religious and civil wars at that time in history, these acts of disarmament appear to have been directed largely at disarming potential political insurrectionists, not ordinary criminals. And during the Revolutionary War, some of the nascent states' legislatures disarmed citizens who—during the war—did not swear loyalty oaths to the cause of the Revolution. *Id*. at 278–79. Again, because these restrictions were

promulgated in the middle of an active rebellion against Britain, they appear to have been targeted at eliminating the ability of the state's ideological enemies to gather into an armed force that could threaten the new-birthed state governments, not at preventing commonplace criminals from possessing firearms. It appears, in other words, that these firearms restrictions were intended to prevent armed counter-revolution, not to promote the states' ordinary police interest in a law-abiding citizenry. *See also Range*, 69 F.4th at 105; Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them.").

Although some have argued that the founding-era restrictions demonstrate that people who are generally "dangerous" fall outside the scope of the Second Amendment, that argument is insufficiently specific. The disarmament statutes upon which the argument relies are firearms restrictions that appear to have been imposed against individuals who could potentially overthrow the state: rebels and ideological enemies, not commonplace thieves. "[S]tripping rebels of their gun rights followed

33

well-established practice in both England and the colonies," but that practice is far removed from permanently disarming people who committed other types of crimes, particularly commonplace ones. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). In fact, it appears that even the "dangerous" groups of rebels were not permanently disarmed: "[P]rohibited persons in the founding era—including armed insurrectionists—regained their rights [to possess firearms] once they no longer posed a violent threat." Greenlee, 20 Wyo. L. Rev. at 269.

Thus, the analysis employed in several post-*Bruen* decisions is not as granular as *Bruen* demands. For example, the initial panel opinion in *Range* ruled that *Bruen*'s analogical test was satisfied because there were various historical restrictions that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. But the notion that some people (who seem largely to have been political dissenters) were deemed "untrustworthy" of hewing to the social compact says nothing about whether, as a historical matter, criminals were categorically disarmed, much less whether particular types of criminals were categorically—and permanently—disarmed.

34

The analysis in decisions like the panel opinion in *Range* is zoomed out to such a broad level of generality that it is unhelpful in answering the question that *Bruen* asks. *See Range*, 69 F.4th at 105 (rejecting, en banc, the panel opinion's analogies as "far too broad"). The relevant question is whether conviction of a felony offense was expected—at the time of the founding—to result in the categorical disarmament of an American citizen for life. There is little—if anything—in the historical record to suggest that it was. Even though founding-era felons were deprived of other rights (such as voting and serving on juries), "we see no explicit criminal, or even more general virtue-based, exclusions from the right to bear arms like we do in other contexts." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting). That absence—as *Bruen* held—means that the founding era likely did not view felon status as falling outside the scope of the Second Amendment. *Bruen*, 597 U.S. at 26–27.

The Government may contend that the Second Amendment allows disarmament of any citizen who is deemed insufficiently virtuous. But that argument assumes that the Second Amendment is a civic right. *Kanter*, 919 F.3d at 463–64 (Barrett, J., dissenting). *Heller*—which established that the Second Amendment is an individual right—

35

precludes that argument, because there is "no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights." *Id.* at 463. *See also United States v. Goins*, 647 F. Supp. 3d 538, 545–46 (E.D. Ky. 2022); Greenlee, 20 Wyo. L. Rev. at 284–85.

To the extent that the Government relies upon historical surety laws, which were adopted by several states "in the mid-19th century" and which "prohibited a person from carrying a weapon if there was reasonable cause to believe that person posed a risk of injury or breach of the peace," that analogy fails, too. *United States v. Holden*, 638 F. Supp. 3d 931, 937 (N.D. Ind. 2022), *rev'd*, 70 F.4th 1015 (7th Cir. 2023). After all, the restriction imposed by surety laws "was surmountable: the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond." *Id.* Section 922(g)(1), by contrast, is permanent and absolute.

Finally, the Government may rely upon *Heller*'s statement that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. But most

36

courts have recognized that this dicta did not decide the constitutionality of all felon-in-possession laws, which *Heller* did not address. *See, e.g.*, *Kanter*, 919 F.3d at 445. And *Bruen*, for its part, specifically explained how historical regulations may provide support for the portion of *Heller*'s dicta pertaining to firearms prohibitions in "sensitive places." *Bruen*, 597 U.S. at 27. The corollary is that, for felon-in-possession statutes to be constitutional, they, too, must be supported by the historical record. Because there is no such historical support here, § 922(g)(1) does not comply with the Second Amendment.

### D.    Section 922(g)(1) violates the Second Amendment as applied to Goode because there is no founding-era analog under which all felons like Goode were permanently disarmed.

In the event that § 922(g)(1) is not facially unconstitutional, it nevertheless is unconstitutional as applied to Goode. Again, *Bruen* holds that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

The conduct reflected by Goode's criminal convictions have been general societal problems throughout American history, and the potential that someone who was previously convicted of those types of felonies could later possess a firearm no doubt existed in Revolution-era America. Yet, as noted above, there is no evidence that the founding generation believed it necessary to address that problem by permanently and categorically disarming everyone who had been previously convicted for those offenses.

At the very least, it is the Government's burden to demonstrate otherwise. Absent identification of such a prohibition, the Government cannot carry its burden of showing that the Second Amendment—as ratified by the people in the 18th century—recognized the government's ability to permanently prohibit anyone from possessing a firearm simply for being convicted of the types of felonies of which Goode was previously convicted. *Id.* at 19. And, of course, the question is not whether the founding generation adopted a version of the Second Amendment that may represent the policy choices that contemporary Americans may choose if the decision were ours to make now; the question is what version

38

of the Second Amendment the founding generation adopted at the time that they adopted it. *Id*.

Because there is no "affirmative[]" proof that the founding generation approved of a lifetime ban on firearm possession for individuals in Goode's circumstances, § 922(g)(1) cannot constitutionally be applied to Goode on the basis of his felony conviction. *Bruen*, 597 U.S. at 19. Because his conviction is unconstitutional, it should be reversed.

## Conclusion

This Court should vacate the district court's order and remand for further proceedings.

## Statement Regarding Oral Argument

Aaron Goode requests oral argument. This Court would benefit from oral argument to ensure that the parties' respective positions can be fully presented and explored.

Respectfully submitted,

Dated: June 12, 2024

/s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Appellant*

39

**Certificate of Compliance**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,527 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 for Windows in 14-point Century Schoolbook font.

/s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Appellant*

## Certificate of Service

I hereby certify that on June 12, 2024, the foregoing document was served on all counsel of record through the CM/ECF system.

 /s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Miller Johnson
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1765
vanstempvoorts@millerjohnson.com
*Counsel for Appellant*

41